UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JOY LYNN HARRIS,

        Plaintiff,

    v.

ANDREW SAUL, Commissioner of Social
Security,

        Defendant.

No. 1:19-cv-01084-GSA

**ORDER DIRECTING ENTRY OF
JUDGMENT IN FAVOR OF PLAINTIFF
AND AGAINST THE COMMISSIONER OF
SOCIAL SECURITY**

## I.    Introduction

Plaintiff Joy Lynn Harris ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 15, 18 and 22.  After reviewing the record, the Court finds that substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff is not disabled.  Accordingly, the Commissioner's decision is reversed and this case is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings in accordance with this opinion.

## II.    Procedural Background

On April 6, 2018 Plaintiff filed an application for disability insurance benefits claiming disability beginning May 1, 2017.  AR 220.  Plaintiff claimed severe pulmonary hypertension and congestive heart failure.  AR 220.  The Commissioner denied the application initially on July 16, 2018 and on reconsideration on September 24, 2018.  AR 93, 100.

Plaintiff requested a hearing on October 13, 2018.  AR 106–107.  Administrative Law Judge

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 6 and 8.

Joyce Frost-Wolf (the "ALJ") presided over an administrative hearing on January 18, 2019.  AR 29–64.  Claimant was represented by counsel Melissa Proudian at the hearing.[2]  AR 29.  On March 8, 2019, the ALJ issued a decision denying Plaintiff's application.  AR 12–28.

The Appeals Council denied review on June 5, 2018.  AR 1–4.  On August 8, 2019, Plaintiff filed a complaint in this Court.  Doc. 1.

### III.   Factual Background

#### A.   Plaintiff's Testimony

Plaintiff testified as follows at the administrative hearing on January 18, 2019.  Plaintiff (born June 8, 1958) lived with her husband and dog in a one-story house.  AR 36.  Plaintiff's highest level of education was high school.  AR 36.  At the onset of her disability she spent most of her time in bed due to fatigue and shortness of breath.  AR 44–45.  She experienced leg swelling, and at one point lost sixteen pounds of accumulated fluid from her legs and chest while hospitalized in June 2017.  AR 45.  To determine the cause of her symptoms she was evaluated by a cardiologist, an allergist and specialists at Stanford.  AR 45.  Treatment improved her functioning somewhat, but she continued to experience shortness of breath when walking, climbing stairs or sitting for extended periods of time.  AR 46.  She could cook for fifteen minutes and otherwise care for herself, but she could not grocery shop nor could she sit for more than an hour due to swelling in her legs.  AR 46–47.  She required elevation and diuretics to alleviate the swelling when it occurred.  AR 46.  The diuretics required bathroom breaks every twenty minutes.

She experienced short term memory loss, which she attributed either to her medication or her shortness of breath.  AR 46.  She could use a computer for fifteen to twenty minutes before requiring elevation of her feet to prevent swelling.  AR 47.  Medications helped her symptoms but did not alleviate her need to elevate her legs.  AR 49.  She could stand for fifteen minutes and only walk an eighth of a block before resting.  AR 51.  Her main symptoms included swelling, fatigue, chest pains and shortness of breath.  AR 51–52.  Two days a week she was too fatigued to get out of bed.  AR 54.  She was unable to use the stairs.  AR 55.

The ALJ submitted a hypothetical to the vocational expert regarding an individual of

---

[2] Plaintiff is now represented by Jonathan Pena on appeal.

Plaintiff's age, education and work history who could perform work at the light exertional level. The vocational expert testified that such an individual could perform Plaintiff's past work as a supervisor, survey worker, loan officer, telephone solicitor, or wedding consultant.  AR 60.  If a condition was added that the hypothetical individual required two or more additional, unscheduled breaks during the workday of twenty minutes in duration in order to elevate her legs to waist level, there would be no work available.  AR 60–61.  If a condition was added that the hypothetical individual was limited to non-complex routine tasks, no past work would be available.  AR 61.  If the individual was off task 15% of the time, no work would be available.  AR 61–62.

### B.   Medical Records

For the sake of brevity, and in light of this Court's holding, the below factual summary will focus on records concerning treatment, diagnoses and testing related to Plaintiff's cardiac condition and pulmonary hypertension.

Plaintiff has a history of uncontrolled hypertension.  AR 337–39.  Plaintiff was treated by Dr. Sam Borno at the Cardiac Institute on March 15–16, 2017 for hypertension and shortness of breath.  AR 546–49.  She underwent a stress echocardiogram which revealed reduced functional aerobic capacity, but otherwise normal heart rate and blood pressure response to exercise.  AR 560. Spirometry testing in May 2017 at the Allergy, Asthma and Immunology center, revealed mild restriction, unimproved upon bronchodilator treatment.  AR 327–28.  A June 12, 2019 examination by Plaintiff's primary care physician, Dr. Mary. A. Sadlek, revealed respiratory distress, wheezing, and blood pressure of 150/102, resulting in a diagnosis of uncontrolled hypertension.  AR 336–37.

On June 16, 2017, Plaintiff was admitted to the emergency room at St. Agnes Medical Center for congestive heart failure, shortness of breath and bilateral lower extremity edema.  AR 454, 468–69.  She was diagnosed with non-ST elevation myocardial infarction and decompensated heart failure.  AR 454.  She underwent a left heart catheterization which revealed elevated left ventricular end-diastolic pressure at 20 mmHg.  AR 489.  She was discharged in stable condition on June 17, 2017.  AR 435–47.

After experiencing continued shortness of breath and bloody cough, Plaintiff reported to Dr. Sadlek on July 13 and August 23, 2017, who diagnosed hypertension, mild viral

cardiomyopathy and referred Plaintiff to pulmonology.  AR 333–35; 379–81.  Plaintiff reported to Dr. Kandsawamy at Community Pulmonary Associates on September 1, 2017, who diagnosed dyspnea, congestive heart failure and pleural effusion.  AR 380–81.  On November 28, 2017, Plaintiff presented to the emergency room at St. Agnes Medical Center with shortness of breath, bloody urine and anxiety.  AR 401.  An examination found bilateral edema and moderate respiratory distress.  AR 405, 407.  She was treated with a nebulizer, prescribed Prednisone and discharged.  AR 408–09.

An echocardiogram completed on December 8, 2017 found ejection fraction of 30%-35%, mild tricuspid regurgitation and pulmonary artery pressure of 64 mmHg.  AR 553–54.  Plaintiff reported to Dr. Zhu at Stanford on February 26, 2018, and a transthoracic echocardiogram revealed, among other things, right ventricular systolic pressure of 78 mmHg and elevated right atrial pressure at 15mmHg, consistent with severe pulmonary hypertension.  AR 614.  She was diagnosed with pulmonary hypertension and class two heart failure.  AR 580.  She tested positive for amphetamine use and additional testing was ordered.  AR 581.  Dr. Spiekerkoetter reviewed the records concluding that Plaintiff was likely suffering severe pulmonary hypertension secondary to toxins (diet pills and stimulants), severe right ventricle dilation and markedly reduced function.  AR 747.  Dr. Spiekerkoetter recommended right heart catheterization pending confirmation of a negative drug screen on follow up testing.  AR 747–48.  Plaintiff's three subsequent amphetamine tests were negative.  AR  569, 576, 582, 587, 600–01.

Plaintiff underwent a right heart catheterization on March 22, 2018.  AR 570–72.  Plaintiff reported to Dr. Spiekerkoetter on April 9, 2018 for test results, who diagnosed severe pulmonary hypertension with increased pulmonary artery pressure of 55mmHg.  AR 568–69.

Dr. Spiekerkoetter issued a letter on April 30, 2018 reporting a diagnosis of pulmonary arterial hypertension and an elevated mean pulmonary artery pressure of 49 mmHg.  AR 685.  Plaintiff continued treatment with Stanford clinics from May 2018 through October 2018 for pulmonary hypertension and chronic right heart failure.  AR 757–885.  On September 10, 2018, a transthoracic echocardiogram revealed elevated right ventricular systolic pressure at 46 mmHg.  AR 834.  Dr. Chang diagnosed pulmonary hypertension with improvement in functional status.  AR

841–43.  Lab results revealed another positive finding for amphetamines, which Plaintiff denied using.  AR 872.  Dr. Spiekerkoetter completed an undated medical source statement regarding Plaintiff's limitations due to pulmonary arterial hypertension, estimating RVSP of 70 mmHg based on echocardiogram, with pulmonary artery pressure of 57 by right heart catheterization, but without identifying the date of the procedures to which either of those figures relate.  AR 892.

### C.   Agency Medical Consultants

The medical portion of claimant's disability determination at the initial level reflects a medical opinion from state agency medical consultant Dr. Roger Fast, dated July 11, 2018.  Dr. Fast opined as follows:

> Claimant has listing level pulmonary hypertension, but her high RVSP (78) and high systolic PAP (>60) were not diagnosed until well after DLI [Date Last Insured].  She had a stress echo in 03/17 and was able to walk on the treadmill 6 minutes on Bruce protocol, indicating better than 5 METS.  I don't think we can infer listing level disease to DLI.  She gives a history of meth abuse in her 20s and 30s, and denied recent use.  However, in 02/18 her screens were positive and it may by that her recent worsening is related to using again.

AR 71, 75, 87.

### IV.   Standard of Review, Generally

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.   "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence could reasonably support two conclusions, the court "may not substitute its

judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.      **The Disability Standard**

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI.     **The ALJ's Decision**

The ALJ found that Plaintiff had not engaged in substantial gainful activity from the alleged onset date of May 1, 2017 through her date last insured of September 30, 2017. AR 17. The ALJ

6

found that, through her date last insured of September 30, 2017, Plaintiff's severe impairments were as follows: left knee mild degenerative changes and pulmonary arterial hypertension.  AR 17. The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925, 416.926).  AR 18.

The ALJ concluded that Plaintiff had the residual functional capacity to perform her past relevant work as a telephone solicitor, loan officer, supervisor, survey worker, and wedding consultant.  AR 22.  The ALJ also concluded that Plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b).  AR 22.  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined in the Act.  AR 23.

**VII.**   **Issues Presented**

Plaintiff asserts three claims of error: 1) that the ALJ erred at step three by failing to consider the applicability of Listing 3.09 (chronic pulmonary hypertension); 2) that the ALJ erred by rejecting the opinions of her treating physicians Dr. Sadlek and Dr. Spiekerkoetter; and 3) that the ALJ failed to include work-related limitations consistent with the nature and intensity of Plaintiff's limitations.  Br. at 1, Doc. 15.

Defendant responds that Plaintiff waived her argument under Listing 3.09 by not raising it below, and that she would not satisfy the listing's requirements in any event because she did not undergo the required medical procedure.  Because the Court finds that remand is appropriate to consider the applicability of Listing 3.09 at step three, the Court will not address Plaintiff's second and third claims of error.

**A.**   **Applicable Law**

At step three, ALJs must consider whether a claimant's severe impairments meet or medically equal an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. §§ 416.920(a)-(f).  "To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim.  To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings at least equal in severity and

7

duration to the characteristics of a relevant listed impairment . . ." *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) (emphasis in original) (internal quotations omitted).

An affirmative finding at step three results in a determination of disability without proceeding to steps four or five. *See* 20 C.F.R. § 416.920(d) ("If you have an impairment(s) which meets the duration requirement and is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience."); 20 C.F.R. §§ 416.927, 416.929 (noting that the ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled); *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001) ("If a claimant has an impairment or combination of impairments that meets or equals a condition outlined in the 'Listing of Impairments,' then the claimant is presumed disabled at step three, and the ALJ need not make any specific finding as to his or her ability to perform past relevant work or any other jobs.").

Claimants generally bear the burden to prove entitlement to disability benefits. *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); 20 C.F.R § 404.1512(c). However, Social Security hearings are non-adversarial. *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). Whether or not the claimant is represented by counsel, the ALJ "must inform himself about the facts relevant to his decision." *Heckler v. Campbell*, 461 U.S. 458, 471 n. 1 (1983). ALJs must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listing. A boilerplate finding on this point is insufficient. *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).

### B. Analysis

As to Plaintiff's claim that the ALJ erred by failing to consider the applicability of Listing 3.09 at step three, two distinct issues are implicated by the party's briefs: 1) whether Plaintiff waived the Listing 3.09 argument by not raising it below, and 2) whether the proper medical procedure was performed to establish the condition set forth in Listing 3.09.

## 1.   **Waiver**

Defendant relies on *Meanel* to support his argument that Plaintiff waived Listing 3.09 by not raising the issue below.  *See* Resp. at 5, Doc. 18 (citing *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999)).  In *Meanel*, the Ninth Circuit stated as follows:

> We now hold that, at least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal. The ALJ, rather than this Court, was in the optimal position to resolve the conflict between Meanel's new evidence and the statistical evidence provided by the VE. We will only excuse a failure to comply with this rule when necessary to avoid a manifest injustice, which will not occur here.

*Meanel*, 172 F.3d at 1115.  There are several reasons why a finding of waiver is not appropriate here.

The specific factual circumstances of *Meanel* involved new evidence raised on appeal, not new issues. That is, the claimant was barred from raising new evidence (statistical job data) before the district court that she did not raise before the ALJ.  *Id.*  Here, by contrast, all relevant evidence was part of the administrative record, and Plaintiff is not seeking to raise new evidence on appeal.

Additionally, Plaintiff's omission here was not nearly as grievous as many other examples in the case law applying *Meanel's* waiver doctrine.  Plaintiff is not, for example, attempting to assert the existence of an entirely new medical impairment on appeal, nor did she altogether neglect to address the underlying condition set forth in Listing 3.09.  *Cf. Robinson v. Apfel*, 232 F.3d 896 (9th Cir. 2000) (Robinson appeared before the ALJ with an attorney and *did not raise the issue of her amputated finger*. She thus waived judicial review of this issue) (emphasis added); *Shaibi v. Berryhill*, 883 F.3d 1102, 1108–10 (9th Cir. 2017) ("when a claimant fails *entirely* to challenge a vocational expert's job numbers . . . the claimant forfeits such a challenge on appeal . . . Shaibi *did not even obliquely suggest* that the VE's job estimates might be unreliable *at any point during administrative proceedings*.") (emphasis added).  Here, Plaintiff's counsel addressed the medical history related to the underlying condition of pulmonary hypertension, addressed the associated

9

findings of elevated pulmonary artery pressure and addressed the related cardiac catheterization testing, all of which relate directly to Listing 3.09. *See* AR 296–301, 308–17. She simply omitted any specific reference to Listing 3.09 or its requirements, opting instead for a catchall statement that "all listings applicable to this case should be considered." AR 297.[3]

This omission was not prejudicial to the Commissioner who was on notice of the relevance of Listing 3.09. *See Simpson v. Berryhill*, 717 F. App'x 670, 673 (9th Cir. 2017) ("in *Meanel*, the claimant rest[ed] her arguments on additional evidence presented for the first time on appeal, thus depriving the Commissioner of an opportunity to weigh and evaluate that evidence . . . That is not the situation here, and the Commissioner is not prejudiced by Simpson's failure to raise the issue below."). Indeed, the Commissioner here had an opportunity to weigh and evaluate the evidence related to Listing 3.09 and did so in reaching a disability determination. *See* AR 72, Disability Determination Explanation (reflecting that the "Adult Listings Considered" included 3.09 (Chronic Pulmonary Hypertension Due to Any Cause)); *see also* AR 75 (in which state agency medical consultant Dr. Fast noted in the medical portion of the disability determination that "claimant has listing level pulmonary hypertension" but that the relevant procedure was not conducted "until well after DLI [date last insured].").

Moreover, of the nearly 4,000 cases that have cited *Meanel* since it was decided twenty years ago, Defendant does not identify any explicitly applying *Meanel* to the present set of facts. Defendant relies on *Steward*, an unpublished district court case involving a separate question of whether a claimant must preserve a listing argument by raising that argument before the Appeals Council[4] (as opposed to raising it before the ALJ, which is the issue addressed by *Meanel*). Resp.

---

[3] While perhaps not a model of thorough advocacy, and which might have been insufficient to preserve the claim for appeal, there were other countervailing circumstances as explained herein.

[4] *Steward's* holding on that point is questionable in light of *Sims*, in which a plurality of the Supreme Court determined that a claimant need not preserve issues before the appeals council because social security proceedings are "not adversarial" and "the Council, not the claimant, has the primary responsibility for identifying and developing the issues." *Sims v. Apfel*, 530 U.S. 103, 103–04 (2000). Separately, other courts have also observed that *Meanel* is called

at 5, Doc. 18 (citing *Steward v. Astrue*, 2012 WL 4210624 (D. Or. Sept. 19, 2012) (unpublished)). Thus, *Steward* is neither controlling nor persuasive authority.

Notably, *Meanel* set forth an exception to the waiver doctrine noting that a claimant's failure to preserve an issue for appeal will be excused "when necessary to avoid a manifest injustice." *Meanel*, 172 F.3d at 1115.  This exception has been interpreted as granting reviewing courts discretion in applying the waiver doctrine.  *See, e.g.*, *Rayborn v. Colvin*, No. 3:15-CV-01478-HZ, 2016 WL 5799348, at *5 (D. Or. Sept. 30, 2016) ("Finally, even if Meanel applies and Plaintiff waived the issue, I exercise my discretion to address it.").  It is worth noting that Plaintiff is represented by a new attorney on appeal, a fact which counsels against a finding of waiver.  The Court hesitates to impute her former attorney's omission to Plaintiff and her new attorney, particularly where her former attorney is not present to justify her advocacy strategy.

This factual record warranted discussion of Listing 3.09 by the ALJ.  The administrative record in this case contains 194 references to Plaintiff's "pulmonary hypertension."  The ALJ found that one of Plaintiff's two severe impairments was "pulmonary arterial hypertension" and observed that Plaintiff was diagnosed with "chronic hypertension" in August 2017.  AR 17, AR 20.  The disability determination at the initial level reflects that the Commissioner considered the applicability of Listing 3.09 (chronic pulmonary hypertension) and the associated opinion of state agency consultant Dr. Fast who specified that "Claimant has listing level pulmonary hypertension," although he opined that the relevant procedure(s) post-dated Plaintiff's date last insured.  AR 75.  Defendant's argument that an ALJ need not address "every potential listing" is not well taken here as the facial relevance of Listing 3.09 (chronic pulmonary hypertension) seems readily apparent.

---

into doubt by *Sims*. *See, e.g.*, *Smith v. Berryhill*, No. 216CV01284JADGWF, 2018 WL 5075963, at *7 (D. Nev. Mar. 29, 2018) ("Meanel, however, has been called into doubt by *Sims* . . ., in which the Supreme Court held that because Appeals Council has the primary responsibility for identifying and developing the issues, the claimant can raise issues for the first time on judicial review.").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The ALJ concluded that only Listing 1.02 (Major dysfunction of a joint) warranted discussion. That conclusion is not supportable given this factual record.  Accordingly, a finding that Plaintiff waived her Listing 3.09 argument is not warranted.[5]

### 2.  The Requirements of Listing 3.09

Listing 3.09 reads as follows: "Chronic pulmonary hypertension due to any cause (see 3.00L) documented by mean pulmonary artery pressure equal to or greater than 40 mm Hg as determined by cardiac catheterization while medically stable (see 3.00E2a)."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

Defendant argues that even if Plaintiff did not waive the argument, the Court should find that the ALJ did not err because Plaintiff does not satisfy the criteria of the listing.  Resp. at 6, Doc. 18.  Specifically, Defendant notes that Listing 3.09 requires that mean artery pressure be established by means of cardiac catheterization while medically stable, and Defendant contends that "[t]he present record does not reflect that this specific procedure was conducted, and where spirometry procedure was conducted as defined under 3.00E2a the results were consistently 'normal.'"  *Id.*

Defendant's point about the spirometry results is unclear.  Listing 3.09 cross-references 3.00E2a (which discusses spirometry) to borrow its definition of "medically stable" which is the condition the patient must be in during cardiac catheterization in order to yield a valid mean pulmonary artery pressure reading (hereinafter "mPAP") under listing 3.09.  It therefore appears that Plaintiff's "normal" spirometry results mean Plaintiff was considered "medically stable" under 3.00E2a for the purpose of undergoing a cardiac catheterization.  But Defendant's position is that Plaintiff did *not* undergo a cardiac catheterization.  It is not clear why Defendant's discussion of spirometry readings is significant, and Defendant does not offer an explanation.

---

[5] It bears mentioning that the Court makes no opinion on whether Plaintiff in fact met the requirements of Listing 3.09 through her date last insured. Rather, the lack of consideration of the issue by the ALJ given this record warrants remand.

1    Moreover, Defendant's contention that "[t]he present record does not reflect that this

2    specific procedure was conducted" (referring to a cardiac catheterization) is not correct.  Plaintiff

3    did undergo a cardiac catheterization on June 16, 2017, and again on March 22, 2018.  AR 19, 224,

4    225, 405, 406, 410, 440, 489, 567, 570, 571, 575, 579, 721, 745, 850.  Whether these procedures

5    (or her echocardiography procedures) established an mPAP reading of 40 mmHg as required by

6    Listing 3.09 is a separate question, however, as is the timing of those procedures in relation to

7    Plaintiff's date last insured.

8    Plaintiff's June 16, 2017 left heart catheterization at St. Agnes Medical Center revealed left

9    ventricular end-diastolic pressure at 20 mmHg, which does not appear to establish a "mean

10   pulmonary artery pressure equal to or greater than 40 mm Hg" as required by Listing 3.09.  Plaintiff

11   also underwent a transthoracic echocardiogram (TTE) on December 8, 2017 which revealed

12   "moderate to severe pulmonary hypertension (64 mmHg)" (AR 85), and she underwent another

13   TTE on February 26, 2018 which revealed an RVSP (right ventricular systolic pressure) of 78

14   mmHg, consistent with severe pulmonary hypertension (AR 614, 721).  Although both readings

15   exceeded 40 mmHg (as required by Listing 3.09), neither specified that the reading was for *mean*

16   pulmonary artery pressure (as also required by Listing 3.09).  The court in *Sellars* addressed a

17   similar situation:

> The December 11, 2013 record documents only a pulmonary artery pressure
> ("PAP") of 50 mm Hg with no indication as to whether the pressure indicated was
> a mean figure. To be sure, the other records cited to by Plaintiff do indeed document
> a <u>systolic</u> artery pressure of greater than 40 mm Hg, but they fail to establish the
> requisite <u>mean</u> pulmonary artery pressure of greater than 40 mm Hg. Systolic artery
> pressure is not the same as mean artery pressure: [Mean pulmonary artery pressure]
> reflects the steady component of flow and the functional status of the distal
> (resistive) pulmonary veasculature, while [systolic pulmonary artery pressure] is
> expected to encompass the pulsatile component of arterial load, which includes the
> characteristics of right ventricular ejection and the characteristics of the proximal
> (elastic) pulmonary arteries and wave reflections. Chemla et al., New Formula for
> Predicting Mean Pulmonary Artery Pressure Using Systolic Pulmonary Artery
> Pressure, 126 Chest Journal 1313, 1314 (2004) (footnotes omitted).

*Sellars v. Berryhill,* No. 2:17-CV-31, 2018 WL 3872319, at *5 (S.D. Ga. Aug. 15, 2018), report

and recommendation adopted, No. 2:17-CV-31, 2018 WL 4343408 (S.D. Ga. Sept. 11, 2018) (citations omitted) (emphasis in original).  Thus, it does not appear that either echocardiogram (TTE) established a reading for mPAP, as required by Listing 3.09.

Moreover, Listing 3.09 requires that the mPAP be established by a cardiac catheterization, not an echocardiogram.  Consistent with that requirement, medical literature on the subject suggests that echocardiography can facilitate a reasonably accurate estimate of mPAP and is a useful screening tool for pulmonary hypertension, but that a definitive diagnosis of pulmonary hypertension should be reserved for cardiac catheterization.[6]  This perhaps provides some context to interpret the February 26, 2018 echocardiogram results, which were stated to be "*consistent with* severe pulmonary hypertension" (but perhaps not *conclusive of* severe pulmonary hypertension).  AR 571, 614 (emphasis added).

Finally, Plaintiff underwent a right heart catheterization on March 22, 2018,[7] which revealed "severe PAPm of 55 . . . at baseline and in response to iNO with PAPm 49" resulting in a diagnosis of severe pulmonary arterial hypertension.  AR 568–69.  Plaintiff's cardiologist, Dr. Spiekerkoetter, issued a letter in support of Plaintiff's disability application on April 30, 2018 reporting a diagnosis of pulmonary arterial hypertension and an elevated mean pulmonary artery pressure of 49 mmHg.  AR 685.  Although Dr. Spiekerkoetter did not specify which procedure she was basing this reading and diagnosis on, this appears to be the first instance in the record specifying a *mean* pulmonary artery pressure (as required by 3.09) and it does appear that this was based on the March 22, 2018 right heart catheterization, which noted "PAPm 49."  Thus, the March

---

[6] *See See* Silverton, N, et al., The controversy of right ventricular systolic pressure: is it time to abandon the pulmonary artery catheter? Anaesthesia 2015; 70: 241–244, available at https://wiki.library.ucsf.edu/download/attachments/400852716/Anaesthesia%20-%20Cardiothoracic%20Anaesthesia%20Collection%202015.pdf?api=v2

[7] Defendant's doubt as to whether this procedure was performed might stem from the fact that other records state "given the positive test result [for amphetamines], *we cannot immediately proceed with a RHC as planned (originally scheduled for 3/22/2018)* but need to repeat a tox screen to assure the test is negative." AR 581.  But it does appear that the procedure was performed.

22, 2018 right heart catheterization appears to establish that Plaintiff met Listing 3.09 as of that date. Notably, however, that procedure post-dated Plaintiff's last date insured of September 30, 2017.

In sum, Plaintiff underwent a cardiac catheterization (the test required by Listing 3.09) on June 16, 2017, though it appears that no mPAP reading was derived from that test. Plaintiff underwent transthoracic echocardiograms (TTE) (not the required test under Listing 3.09) in December 2017 and February 2018 (both of which postdated her last date insured of September 30, 2017), the results of which were reportedly consistent with (but perhaps not conclusive of) severe pulmonary hypertension. And, finally, she underwent a cardiac catheterization in March 2018, which did appear to establish the elements of Listing 3.09, but which also post-dated her last date insured of September 30, 2017.

With respect to the timing of the relevant procedures vis-à-vis Plaintiff's date last insured, Plaintiff appeared to recognize this as a potential impediment to her claim, and she pre-emptively addressed the issue in her opening brief:

> Defendant may argue that the cardiac catheterization results are insufficient to establish presumptive disability, because the actual test was performed two months after Plaintiff's insured status expired. However, this is unavailing. The ALJ must consider all of the evidence of record in determining whether a claimant meets the statutory definition of disability. SSR 18-1. In situations where onset of disability must be inferred, the ALJ should call on the services of a medical expert to determine the date Plaintiff's impairments became disabling. SSR 18-1. Here, there is no evidence of any intervening worsening of Plaintiff's condition between her date last insured of September 30, 2017 and the date the first testing for pulmonary artery pressure was performed, and a medical expert could therefore draw reasonable inferences as to the likely date that her pulmonary hypertension would meet the Listing, and whether it was prior to the expiration of Plaintiff's insured status. Further, as discussed below, Plaintiff's treating sources asserted that Plaintiff's impairments and limitations have persisted at the same disabling level of severity since May 2017, further supporting the inference that Plaintiff's impairment met the listing within the relevant period.

Br. at 13–14, Doc. 15.

Defendant did not respond to this argument. Rather, Defendant noted that Listing 3.09

15

requires a cardiac catheterization, and Defendant simply took the position that "the present record does not reflect that this specific procedure was performed . . ." Resp. at 6, Doc. 18.  As explained above, this is not correct.

### VIII.   Remand for Further Proceedings

Because the record is not conclusive one way or the other, and the ALJ did not analyze the matter, remand is appropriate to consider whether Plaintiff's post-DLI procedures, in conjunction with her pre-DLI history of hypertension and associated diagnoses, are sufficient to establish that Plaintiff met or medically equaled Listing 3.09 for chronic pulmonary hypertension as of her date last insured (and to further develop the record if necessary to facilitate the analysis of disability onset date).  *See Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

### IX.   Conclusion and Order

Based on the foregoing, the Court finds that substantial evidence and applicable law do not support the ALJ's decision that Plaintiff is not disabled.  Accordingly, it is ordered that the Commissioner's decision is reversed, and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings in accordance with this opinion.  The Clerk of Court is directed to enter judgment in favor of Plaintiff Joy Harris, and against Defendant Andrew Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   __October 29, 2020__         _____ **/s/ Gary S. Austin**
                                                        UNITED STATES MAGISTRATE JUDGE

16